IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDRA KOENIGSBERG, MAXWELL KOENIGSBERG, and OLGA STAMBLER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br><br>THE BOARD OF TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>Defendant. | Case No. 1:23-cv-01044<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Columbia University submitted false data to the various services that rank colleges and universities. As a result, for over ten years, Columbia was ranked higher than it should have been in the U.S. News & World Report—in the top 5. As a result, tens of thousands of undergraduates applied to Columbia, thinking that they were applying to a top 5 "reach" school, when in fact, they were not. This suit seeks to hold Columbia accountable for its actions and have it return to all undergraduate applicants who were denied admission the application fee they paid and which Columbia has unjustly retained.

### PARTIES

1. Plaintiff Alexandra Koenigsberg is a citizen and resident of Cook County, Illinois. Ms. Koenigsberg applied to Columbia University in the fall of 2018. At the time she applied, Ms. Koenigsberg was a minor and her application fee of $85 was paid by her mother, Olga Stambler.

1

2. Plaintiff Maxwell Koenigsberg is a citizen and resident of Cook County, Illinois. Mr. Koenigsberg applied to Columbia University in the fall of 2018. At the time he applied, Mr. Koenigsberg was a minor and his application fee of $85 was paid by his mother, Olga Stambler.

3. Plaintiff Olga Stambler is a citizen and resident of Cook County, Illinois. She paid the application fee of $85 each for the applications of her children, Alexandra and Maxwell Koenigsberg, in the fall of 2018 for their application fees to Columbia University.

4. Defendant, The Board of Trustees of Columbia University in the City of New York (hereinafter "Columbia" or "Defendant"), manages, controls, and acts as the governing body of Columbia University. As such, it is responsible for the actions of the university. The Defendant is located at 535 West 116th St, New York, NY, and its primary place of business is New York County, NY.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Minimal diversity exists because the named plaintiffs are citizens of Illinois while Columbia is a citizen of New York. The proposed class numbers in the tens of thousands. The amount in controversy is well over $5 million.

6. This Court has personal jurisdiction over Columbia because it does business in the State of New York and this District and because all of the wrongful conduct alleged took place in this district.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because all of the events or omissions giving rise to the claims occurred in this District. In addition, all of the transactions at issue here between the Plaintiffs and Defendant took place in New York, all the misleading statements emanated from New York, and all the Defendant's operations took place in New York.

8. This District is the proper venue for this case because Defendant resides in, and is subject to, suit in this District. Furthermore, all of the events that underlie the claims here occurred in this District.

## STATEMENT OF FACTS

9. Columbia University is a private university located in New York, New York. As a member of the Ivy League, it has a reputation as one of the most prestigious universities in the world.

10. All universities, though, compete for prestige and standing in the public eye, and Columbia is no different. While in the past, a university could rest on its laurels, with the rise of more objective college rankings published in major magazines and newspapers, each university is now judged on various factors that affect its ranking as on the list of "best" universities, each and every year.

11. These rankings are not only important to potential applicants, but also to employers and graduate programs looking to understand the quality of the graduates from various colleges and universities.

12. The most popular and well-known undergraduate university ranking is performed by the U.S. News & World Report in its annual survey of Best American Universities. Over the last three decades, U.S. News's rankings have become so impactful, in fact, that a one-rank improvement in the rankings results in a nearly 1% rise in applicants the following year.[1]

13. In compiling its rankings, U.S. News asks for universities to self-report data in 17 fields, that it then uses to rank the various universities and colleges, including: graduation and retention rates, class size, faculty quality as measured by the percent of faculty with a terminal

---

[1] Michael Luca & Jonathan Smith, *Salience in Quality Disclosure: Evidence from the U.S. News College Rankings*, 22 J. Econ. & Mgmt. Strategy 58 (2013).

degree in the faculty field (usually a PhD), percentage of full-time faculty, student-faculty ratio, and others.[2]

14. Each university—including Columbia University—understands how the U.S. News rankings are computed and how important the ultimate ranking is to that university.

15. As Columbia knows, college applicants—like Plaintiffs and the Class—rely on a university's rank in the U.S. News rankings to select which school each student will apply to.[3]

16. Colleges and universities in the United States compete for applicants, and each college and university understands that the greater the number of applicants to a school, the greater the application-fee revenue to that school. Columbia also knew or should have known that a one-rank improvement in the U.S. News rankings for undergraduate universities leads to a one-percentage-point gain in the number of applications.

17. Columbia used the U.S. News rankings to recruit undergraduate applications and knew that consumers would treat those rankings as objective metrics relative to Columbia's peers and believed U.S. News was an independent organization with no financial stake in whether students applied to Columbia or some other undergraduate institution.

18. Undergraduate applicants apply to more than one school and usually several. Because of the typical acceptance rates for schools like Columbia, with an average acceptance rate over the past decade of around 5.6%, college applicants will group schools into categories, such

---

[2] *How U.S. News Calculated the 2022-2023 Best Colleges Rankings*, https://www.usnews.com/education/best-colleges/articles/how-us-news-calculated-the-rankings (last accessed Feb. 6, 2023); Michael Thaddeus, *An Investigation of the Facts Behind Columbia's U.S. News Ranking Executive Summary*, https://www.math.columbia.edu/~thaddeus/ranking/executivesummary.pdf (last accessed Feb. 6, 2023).

[3] *See, e.g.*, Stephanie Saul, *Despite Years of Criticism, the U.S. News College Rankings Live On*, N.Y. TIMES, Sept. 15, 2022, https://www.nytimes.com/2022/09/15/us/us-news-college-ranking.html.

as safety schools, likely admissions schools, and reaches. A student's reach school will nearly always be tied to that school's acceptance rate. Schools like Columbia, with acceptance rates under 10%, are like lotteries, and act as reach schools for all its applicants.

19. In 1988, Columbia was ranked 18th in the U.S News rankings. It bounced between the top ten and lower teens during the 1990s, before accomplishing a rise from 8th to 4th to eventually as high as 2nd in the 2010s-2020s.[4]

20. This rise was due to the reporting of false or misleading data, though, and not to educational or student life improvements.

21. As of 1997, in an effort to improve transparency with respect to college and university hard data, the Common Data Set Initiative ("CDS") was created. The CDS was established "to improve the quality and accuracy of information provided to all involved in a student's transition into higher education" through "the development of clear, standard data items and definitions."[5] However, for over two decades, Columbia refused to participate in the CDS. When Columbia did reveal its information to CDS in 2022, it became clear that the data it had previously submitted to U.S. News was false.

22. Throughout the class period, beginning around 2010-2011, Columbia began reporting false and misleading data to U.S. News in at least the following seven ways.

23. First, Columbia reported false and misleading data regarding class size between 2010-11 and the present. This factor compares the average of class sizes ranging from under 20

---

[4] Michael Thaddeus, *An Investigation of the Facts Behind Columbia's U.S. News Ranking Executive Summary*, https://www.math.columbia.edu/~thaddeus/ranking/executivesummary.pdf (last accessed Feb. 6, 2023).

[5] *See* https://commondataset.org (last accessed Feb. 6, 2023).

students to those with 50 or more. The higher the percentage of classes with 20 or less students, the more this factor augurs in favor of a higher ranking.

24. During the relevant class period, Columbia submitted data to U.S. News, very consistently every year, that over or around 80% of its undergraduates attended classes with fewer than 20 students while fewer than 10% attended classes with 50 or more students.

25. During the relevant class period, though, the true number of classes with fewer than 20 students for undergraduates was at or around 57%.

26. For context, then, instead of having the highest proportion of small class sizes (under 20) in the Ivy League, Columbia actually had the second worst proportion.

27. Second, during the class period, Columbia reported false and misleading data regarding the percentage of full-time faculty with Ph.D. or terminal degrees in their field. Columbia reported 100% of its full-time faculty met this standard—besting Princeton (94%), MIT (91%), Harvard (91%), and Yale (93%). But Columbia's reported figure was false. As of 2020, at least 69 members of Columbia College, most of whom were full-time renewable lecturers in language or faculty in the School of the Arts, did not have a Ph.D. or terminal degree in their field of instruction. Instead, the true percentage was only 95%.

28. Third, Columbia reported false and misleading data regarding its percentage of full-time faculty. This category makes up 1% of the U.S. News ranking. In 2020, Columbia reported to U.S. News that 96.5% of its non-medical faculty were full-time, again besting Princeton, Harvard, MIT, and Yale. But that same year, Columbia reported to the government through the National Center for Educational Statistics that its full-time, non-medical faculty amounted to only 74.1%, which would rank as the lowest percentage in this category for any top 100 U.S. News university. And in reality, the percentage of actual full-time faculty is close to 50%.

29. Fourth, Columbia reported false and misleading data regarding its student-faculty ratio as 6 to 1, which it has reported every year since 2006. The true number is between 11 to 1 and 8 to 1.

30. Fifth, Columbia reported false and misleading data to the government and U.S. News regarding the annual amount of money spent on instruction per student. Here, Columbia reported that its instructional spending in 2019-20, for example, was slightly over $3.1 billion, or over $100,000 annually per student. That figure is the largest figure of any institution of higher learning, and is larger than the combined spending of Harvard, Yale, and Princeton. The real number is at least a billion dollars less, as can be seen in Columbia's year-end consolidated financial statements.

31. Sixth, Columbia reported false and misleading data to the government and U.S. News regarding the annual amount of money spent on research. Here, Columbia touts that it spends over $1 billion annually on research, despite the fact that its government reporting shows spending of only $763 million, and its consolidated financial statements show even less--$660 million.

32. Seventh, Columbia reported false and/or misleading data regarding its student outcomes—namely their graduation and retention rates along with their student debt incurred. Here, Columbia failed to notify its applicants and the U.S. News that its rates for transfer students were much lower than its normally admitted students and that transfer students make up an inordinately high percentage of students at Columbia compared to other top 25 or 50 universities. Had Columbia disclosed this context for its student outcome data, Columbia's reported numbers would have been much less impressive, and the existence of a two-tiered school would have been revealed that would have made it much less desirable.

33.     On information and belief, all of the false and/or misleading data was generated in, and transmitted from, Columbia's campus in New York City.

34.     As a result of Columbia's reporting of this false and misleading data, its rankings in the U.S. News were as follows:

| Year: | Rank: |
|---|---|
| 2011-12 | 4 |
| 2012-13 | 4 |
| 2013-14 | 4 |
| 2014-15 | 4 |
| 2015-16 | 4 |
| 2016-17 | 5 |
| 2017-18 | 5 |
| 2018-19 | 3 |
| 2019-20 | 3 |
| 2020-21 | 3 |
| 2021-22 | 2 |

35.     Had Columbia reported its actual data to U.S. News, it would not have ranked in the top 5 or even top 10 U.S. national universities. But-for Defendant's misrepresentations of the data, Plaintiffs would not have applied there.

36.     All these areas of false reporting were made known to the public by Michael Thaddeus, a mathematics professor at Columbia, when he published an article in February and March 2022 revealing the false and misleading data and how Columbia used that false and misleading data to manipulate its rankings within the US News rankings. Michael Thaddeus, An Investigation of the Facts Behind Columbia's U.S. News Ranking Executive Summary, https://www.math.columbia.edu/~thaddeus/ranking/executivesummary.pdf (last accessed Feb. 6, 2023).

37.     In the wake of the Thaddeus report, Columbia announced it was looking into the allegations. In September 2022, Provost Mary Boyce admitted that certain findings of the report were correct. "On two of the metrics questioned by our faculty member, class size and faculty with

8

terminal degrees, we determined we had previously relied on outdated and/or incorrect methodologies."[6]

38. With respect to class size, the "data was previously reported incorrectly and not in compliance with the U.S. News instructions. While many of Columbia's undergraduate classes have long had under 20 students, the prior methodologies used resulted in overreporting the number of classes with under 20 students and underreporting of classes with between 20 and 29 students." Id. The actual number of undergraduates in classes under 20 was 57%. Id.

39. And rather than follow the U.S. News requirements for determining terminal degrees, Columbia "relied on the University's requirements for appointments to a specific faculty rank in a school or discipline" which "result[ed] in some overreporting." Id. Rather than matching the numbers provided to U.S. News, Columbia admitted that only "95.3% of our full-time faculty have terminal degrees." Id.

40. The Provost concluded "[w]e deeply regret the deficiencies in our prior reporting and are committed to doing better." Id. Despite the statement of contrition, Columbia did not address the other five areas of misreporting in the Thaddeus report.

41. For high school students, deciding which college to apply to is one of the most important and stressful decisions of their lives. In deciding where to apply, college counselors recommend that students apply to at least one safety school that a student is nearly guaranteed to be admitted, at least one match school where a student's grades and test scores closely match those typically accepted by the college, and at least one reach school that has a very low acceptance rate but that would be significantly better ranked than the student's safety or match schools.

---

[6] *Provost Mary Boyce Announces Release of Two Common Data Sets*, https://provost.columbia.edu/statement-common-data-set (last accessed Feb. 6, 2023).

42. Prestigious universities with low acceptance rates do not accept every applicant who could thrive at the college, who "deserve" to go that college, or who meet the average standards for admission. Nor do they accept the top 2,000 SAT or ACT scorers. Instead, each university, including Columbia, attempts to create a class of incoming students who complement each other, would thrive at the university, and satisfy certain values of diversity of the school.

43. Because of this, each student's application to a reach school is a lottery ticket. And because the cost of that lottery ticket is almost universally now $85, only a few such applications may be made.

44. The last year before Columbia began manipulating the data for rankings, 2009 (for admitting the Class of 2009), its overall acceptance rate was 12.4% on 18,120 applications. https://www.ivycoach.com/2009-ivy-league-admissions-statistics/. Over the years, in part because of the false data reporting, applications have increased and the acceptance rate decreased. For the Class of 2012, who would have received decisions in 2008, applications increased to 22,585 while the acceptance rate decreased to 10.7%.[7] A mere five years later, applications increased again to 33,531 while acceptance rates nose-dived to 6.9%. Right before the manipulation was uncovered, applications had further surged to 60,551 with an acceptance rate of only 3.7%.

45. Columbia solicited applications from students across the world via its website and its college brochures and applications. All of these materials were developed in and originated from New York.

46. In addition, Columbia solicited and received all of the application fees in New York.

---

[7] https://toptieradmissions.com/resources/college-admissions-statistics/columbia-university-acceptance-rates/.

47. Both Plaintiffs Koenigsberg applied to Columbia University undergraduate in the fall of 2018. Their mother, Olga Stambler, paid their application fee. Both were denied admission to Columbia University. Neither plaintiff Koenigsberg would have applied for admission to Columbia and plaintiff Stambler would not have paid for such applications had they known the truth about Columbia's data and what should have been its real ranking in the U.S News service.

## CLASS ACTION ALLEGATIONS

48. Plaintiffs bring both counts on their own behalf and on behalf of a class of similarly situated people under Federal Rule of Civil Procedure 23 (a) and (b)(3) seeking damages for Defendant's deceptive acts. The proposed class consists of:

> All persons who applied for undergraduate admission to Columbia University, were denied admission, and paid or caused to be paid an application fee between 2011 and the present.

49. The number of proposed members makes joinder impossible. Each year, Columbia University receives tens of thousands of applications for admission and most of the people applying pay an $85 application fee, each of whom is easily ascertainable. Columbia only accepts approximately 2,000 students per year. So, there are tens of thousands of ascertainable claimants who meet the proposed class definition.

50. The average amount of each claim is $85 plus interest. That amount is too small to warrant an individual action challenging Columbia's actions.

51. The Koenigsberg Plaintiffs claims are typical of the claims of all other members of the proposed class. The Koenigsbergs each applied to Columbia University, each was denied admission, and each paid or caused to be paid the $85 application fee.

52. The Koenigsberg Plaintiffs will fairly and adequately protect the interests of the proposed class. and have retained counsel competent and experienced in both consumer litigation and class-action litigation.

53. There are questions of law and fact common to the proposed class, including:

- whether Defendants submitted false or misleading data to the U.S. News rankings;
- whether Defendants were unjustly enriched by their actions;
- whether Defendants actions violated GBL Section 349 or 350; and
- the proper measure of damages or restitution to the members of the class, each of whom paid the same fee and was misled in the same way.

54. Because each class member has the same legal rights under New York law, was misled in the same way, and had paid the same application fee as every other proposed class member, there is a well-defined community of interest in this litigation suitable for class treatment.

55. Because the common questions of law and fact predominate over any individual issues, class treatment is also appropriate.

56. A class action is the superior method of litigating this case because it will be more fair and efficient than allowing thousands of individual actions to proceed over each $85 application fee. Given the expense of litigation, the economies of time and effort to be saved in one action, the uniformity and fairness of one decision for all like cases, a class action will allow for the best, most practicable method of adjudication.

## COUNT I—Violation of GBL § 349

57. Plaintiffs re-allege and incorporate each of the preceding allegations in this count.

58. New York consumer law, specifically GBL § 349, makes it illegal to engage in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ."

59. Columbia's business is education. It derives its income from, among other things, tuition from its students, and application fees from the large pool of applicants to its school it receives every year. Columbia's application fees alone net millions of dollars every year to the university.

60. Columbia understands that the U.S. News ranking system drives applicants to apply to certain schools based on where each school is ranked, and that higher rankings will drive more applicants to that school.

61. Plaintiff and the Class members were all applicants to Columbia and paid money in support of their application.

62. Columbia's actions that misled applicants by supplying false data to U.S. New were "consumer-oriented."

63. Columbia engaged in unlawful, unfair, and deceptive acts and practices in violation of GBL § 349 as described in this complaint. By feeding false data to U.S. News, it knew its rankings would be affected and that more students would apply to it as a result. It never qualified its data or alerted the public or the class to the true data or information as contained herein.

64. Columbia's uniform statements, representations, and omissions to U.S. News, the Plaintiffs, and the Class were intended to—and did— induce potential students, including Plaintiff and the Class members, to file an application and pay the application fee to Columbia.

65. Columbia's statements, representations, and omissions were material to the decisions by Plaintiff and the Class members to apply and pay the application fee to Columbia, and proximately caused them to pay that application fee.

66. Columbia's statements, representations, and omissions were objectively false, misleading, and deceptive.

67. Because of Columbia's actions, Plaintiffs and the Class were robbed of the ability to apply to a school ranked in the top 5 of the U.S. News rankings as a reach school, and instead wasted their $85 application fee on a school that should have been ranked much lower and so would not have been a school that the Plaintiffs or the Class would have applied to.

68. Columbia's use of deceptive acts and practices in the conduct of its business violated GBL § 349.

69. Columbia's acts and practices caused the likelihood of confusion and misunderstanding within the Class as to its proper ranking within the U.S. News rankings, thereby violating GBL § 349.

70. By representing to U.S. News that it possessed certain characteristics, qualifications, requirements, benefits, and levels of attainment that it knew itself not to possess, Columbia violated GBL § 349.

71. By representing that it was of a particular standard, quality, or grade, under circumstances in which it knew that such representations and reporting were not true at the time made, Columbia violated GBL § 349.

72. Columbia knew that its data would be used by U.S. News to compile its ranking and that the consumer-public would read those rankings and college applicants would use those rankings in deciding which schools to seek admission to for undergraduate education.

73. Columbia's unfair competition and deceptive practices actually deceived or had the tendency to deceive the students who filed applications with it, including Plaintiff and the Class members.

74. Plaintiffs and the Class members had no means of knowing or learning that Columbia was engaged in the unfair methods of competition and deceptive acts or practices described herein.

75. If Plaintiff and the Class members had knowledge of Columbia's unfair methods of competition and deceptive acts or practices described herein, they would not have applied for admission to Columbia.

76. Columbia's violations of GBL § 349, as described herein, were immoral, unethical, and unscrupulous.

77. Columbia's violations of GBL § 349, as described herein, have directly caused Plaintiff and the Class members to have suffered ascertainable losses—each one paid an $85 application fee they would not have to Columbia had the truth been known—and defendant is liable for that amount because they were the proximate cause of those damages.

### COUNT II—Violation of GBL § 350

78. Plaintiffs re-allege and incorporate each of the preceding allegations in this count.

79. New York consumer law, specifically GBL § 350, makes it illegal to engage in "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ."

80. Columbia engaged in false advertising in violation of GBL § 350 as described in this complaint. It fed false data to U.S News, that unfairly and unjustifiably boosted its ranking, resulting in more students applying as a result and driving up application fee revenue. It never qualified its data or alerted the public or the class to the true data or information as contained herein.

81. Columbia's actions that misled applicants by supplying false data to U.S. News were "consumer-oriented."

82. Columbia knew the information it gave to U.S. News would affect its ranking. Applicants rely on that ranking in deciding which schools to apply to for admission.

83. Feeding this false data to U.S. News was a form of advertising. Columbia knew that a higher ranking would be disseminated nationally by U.S News, influencing applicants, advisors, parents, and other individuals.

15

84. This false advertising impacted the entire college applicant pool. Rather than applying to a "top five" undergraduate program, Columbia was able to divert application fees from those programs to itself.

85. Plaintiffs and the Class learned of, and relied upon, the rankings of U.S. News in applying to Columbia.

86. Had Plaintiffs and Class members known that Columbia falsely misrepresented their data, they would not have applied to Columbia.

87. Columbia's violations of GBL § 350, as described herein, have directly caused Plaintiff and the Class members to have suffered ascertainable losses—each one paid an $85 application fee they would not have to Columbia had the truth been known—and defendant is liable for that amount because it was the proximate cause of those damages.

## COUNT III—Claim for Restitution or Recission in Equity

88. Plaintiffs reallege each of the preceding allegations in this count.

89. At all relevant times, Columbia knew that its U.S. News ranking was important in the application decision of prospective college students, and that misreporting the data as discussed herein would materially affect its U.S. News ranking, making it appear better than it would have been had the correct data been reported.

90. At all relevant times, Columbia knew that a higher U.S. News ranking would result in more applications from more applicants and that this would generate more money for Columbia.

91. Plaintiffs and the class members decided to apply to Columbia mainly because of its high U.S. News ranking and the effect that those rankings had on the perception of the institution.

92. Columbia's actions as found herein were false, immoral, unethical, and/or unscrupulous.

93. As a result of Columbia's false, immoral, unethical, and unscrupulous conduct, it was enriched at the expense of the proposed class through the receipt of an application fee from each class member, and it is against equity and good conscience to permit Columbia to retain such enrichment.

94. Under the theory of unjust enrichment, then, Columbia should make restitution to each class member the amount of their application fee, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendant as follows:

A. finding that Counts I, II, and III may be maintained as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the proposed class defined above, appointing Plaintiffs as the Class representatives, and designating their counsel as Class Counsel;

B. awarding judgment to Plaintiff and the Class for all available monetary or equitable relief requested, including pre- and post-judgement interest, attorney's fees, and expenses; and

C. granting any other relief as the Court may deem just and proper in the situation.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury in this action of all issues so triable.

DATED: February 7, 2023       Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
E-Mail: kim.miller@ksfcounsel.com

*Local Counsel for Plaintiffs*

**HEFFNER HURST**
Matthew T. Heffner (*pro hac vice forthcoming*)
Matthew T. Hurst (*pro hac vice forthcoming*)
30 N. LaSalle Street
Suite 1210
Chicago, Illinois 60602
Telephone: (312) 346-3466
Facsimile: (312) 346-2829
mheffner@heffnerhurst.com

*Lead and Proposed Class Counsel for Plaintiffs*